The next matter on our calendars, United States v. Jeremy Waver. Good morning, counsel. Good morning. May it please the court, my name is Maura Buckley, I'm an assistant federal defender in the District of Connecticut and I represent Mr. Jeremy Waver. I also represented Mr. Waver at the sentencing below in the District Court. The District Court's determination that a sentence of more than twice the top of the guideline range in this case was appropriate was driven by a clearly erroneous factual finding which ultimately results in an abuse of discretion. The factual finding that Mr. Waver knowingly risked the decedent's life because he knew what was in the heroin that he had sold to her clearly drove the sentence in this case. And it drove it by way of either an upward departure or a variance. And I do want to point out, it appears that in the government's brief the government focuses with regard to that argument and the erroneous factual finding on the upward departure, but we have argued it as an erroneous basis for an upward departure or a variance. Either way you look at it, the basis, which is that assumption that Mr. Waver knew what the heroin, what the drugs were adulterated with, the foranofentanil and the fentanyl. In this case in particular- Counsel, when we look at the sentencing to which we give the court a lot of deference, and what do we do with him saying, whether I got this right or wrong, I would sentence this defendant to this amount of time anyway? Well, Your Honor- Aren't we dealing with harmless error is my- No, Your Honor. And you're not dealing with harmless error. And I would direct the court, if I may, and if I could just grab my brief, I think I left it down here, to page ten of our brief in chief. Where the court articulates, first off, that it's going to grant the upward departure by saying, and I'm convinced specifically that you knowingly risk the decedent's, and I have inserted decedent's, death with this ultra hazardous substance. I'm going to skip forward a few lines. He justifies the upward departure based on that. And then says, I would also say that even if the facts here did not meet the requirements under the upward departure provision of 5k 2.1, I would still grant an upward variance on account of all the aggravating facts before me, as I've described them, and impose the same sentence that I'm ultimately going to impose. Your Honor, the aggravating facts that the court has articulated up to the point where his honor states that, includes very vehemently that he believed that Mr. Waver knew what those drugs- There was no evidence to that. Thank you, Your Honor. There was no evidence to that. And if I could just turn to, I've flip-flopped the argument purposely. It was clear error to find that Mr. Waver knew, because there was no evidence, because the government offered no evidence. And this wasn't- I thought what the district court was saying was it's 2019. We have deaths from fentanyl-laced heroin all the time in this country. It's a scourge. And anyone who's been dealing drugs as much as Mr. Waver has can reasonably be presumed to know that he is risking at least serious injury as 5K21 contemplates. And that he didn't need a specific finding as to intent or knowledge based on the pattern of activity that Mr. Waver engaged in, the knowledge that death in fact did result, and given just conditions in our country right now. So why was that an abuse of discretion? A couple of things. If I may just, and I may be mishearing this, Your Honor, and I apologize if I am. But I would disagree that he didn't find that there was knowledge on Mr. Waver's part. And I apologize if that's not what Your Honor said. No, I think he's saying it is fair to presume knowledge. That he wasn't looking for testimony. Like a- Because he was a professional drug dealer. Yes, yeah. And all of those are reasons, frankly, you're correct, that the district court based its decision that he knew or its assumption that he knew. But the problem is, frankly, they are assumptions. It's not evidence. So the judge had to assume, the district court judge had to assume that Mr. Waver's reading the paper, watching the news, it's shocking how many people are woefully uninformed. He's in the business. Well, and I'd like to address- He was in the business. You don't have to read the newspaper to know that people are dying. I would like to address that, Your Honor, and you're not correct. However, if we look at his record, and I don't think it's fair to draw that he was some high level drug dealer, sort of inference, or someone who was mixing the drugs. But if you look at his record, the majority of his drug offenses, however they were negotiated, ended up as possessory offenses. This is a low level street dealer. If the district court's assumption that someone who has many drug offenses has some grander business plan to mix these lethal drugs in, and assume that they now know. Excuse me, I think that I read the district court to look also at the fact that Mr. Waver had no gainful employment over a sustained period of time. Is that incorrect? It's not incorrect. I'm not debating that Mr. Waver dealt in drugs. What I'm debating is that he, if you look at the district court's entire sort of exposition as to why the court believed that Mr. Waver knew that there was something more lethal in the drugs that he sold the decedent. It covers an assumption that Mr. Waver is actually mixing the drugs, or that he had an idea that this. I'm not sure why that's so. If you're dealing drugs, I mean, someone brought the decedent to Mr. Waver, my understanding is correct. And Mr. Waver, we don't know where he had procured the drugs from. But I think what the district court was saying is that anyone who is dealing regularly in heroin, his possession convictions may not have been all, it may have been possession convictions and not all distribution. But nonetheless, so someone brought the decedent to him to procure heroin. And even if Mr. Waver himself didn't package the heroin,  today could be reasonably presumed to have knowledge that he was at least risking that there was something else mixed in, i.e. fentanyl, and that he was at least risking very serious injury on the people to whom he provided the substance. So again, I'm not entirely seeing why that's wrong. Your Honor, I see I'm out of time on this portion. You can answer the question. May I? Thank you. Your Honor, based on the court's interpretation of what the district court has said, and I don't necessarily disagree with the interpretation, but I do want to sort of correct or add in at some point the district court was talking about the scale and imputing that Mr. Waver had been mixing the drugs because there was a scale and there was no evidence that he was packaging these drugs. So our position is that the district court found just a bit more. It's not no evidence, bags in his apartment, so that's some evidence. Not direct evidence of packaging, but it's circumstantial evidence that he was involved in packaging. Employing the preponderance of the evidence standard, which I know is certainly not the highest standard, but it requires more than speculation. The government offered no connections to show that Mr. Waver knew what was in the drugs. What level of knowledge do you think the government should be put to proof of showing by a preponderance? Reckless disregard of the purity of the heroin? Or having absolutely kind of mixed with certainty knowing that, having asked someone that this is at least with fentanyl, right, and gotten an answer. Yes, what would you propose? Well, I think, Your Honor, if the government had been able to demonstrate or had even brought up the fact that he had any awareness that customers were coming back talking about issues with use of the drugs he had been selling, and I don't want to be bound to this lest I'm in front of this court on a similar issue in the future. But I think at the very least something to that effect, a report back by customers as to what was happening to them when they were using it. Certainly people may overdose and not necessarily die and be a repeat customer, but looking at some of the cases that the government cited in its own brief as supporting, if we're just talking upward departure. Some of those cases, and I'll refer to page 19 and 20 of the government's brief, give examples. The Swager case, if I'm pronouncing that correctly, from the Eighth Circuit. An upward departure was sanctioned there under 5K2.1 because the defendant warned the decedent, or instructed the decedent. Well, first warned the decedent to be careful and instructed the decedent to start with a half a bag. Don't use an entire bag. In Higoro, a Fifth Circuit case, the defendant didn't let anyone use the drugs, I believe it was heroin, outside his presence because it was inferred that he knew just how dangerous. And finally, in Nosson, there was a personal connection between the defendant and the decedent, where the decedent was known by the defendant to mix black tar heroin with cocaine. So I think certainly more than an assumption that Mr. Waver, and I'm not trying to be frankly cute by saying had some sort of business plan. This was alluded to by the district court that this is what drug dealers do to get repeat customers. But there was no evidence that Mr. Waver was even at that level of, I don't mean to elevate the level of functioning or thinking that this is what I'm going to add in, this is what I'm selling. It's incredibly telling that the government never offered any evidence, and they had plenty of opportunities to rebut my statements at the change of plea. Because we did not want there to be an issue with the fact that Mr. Waver had disavowed any knowledge of what was in the heroin and crack cocaine. But also at the sentencing itself, the government stated he may or may not have known. That's not a preponderance of the evidence. I know it's a low standard, but may or may not have known doesn't sound like a very confident proffer that he knew. I'm well over my time. Thank you. Thank you. Thank you, have a good time for rebuttal. We'll hear from the government. Good morning, your honors. May it please the court, my name is Jennifer Lariah, and I represent the United States. I also represented the government at the sentencing below. So why isn't this double counting to increase for the death of the user, since this is already implied in the two previous sections that the judge relied on? I'm not sure if I understand the court's question, double counting with respect to the death, or double counting is. Your honor, there are two bases for Judge Meyer's decision. As the court knows, one, the court found the departure under section 5k2.1, that was the specific provision of the guidelines which references death. Section 2D1.1, which would otherwise govern a typical drug case, except in the circumstance where the government has charged the offense, the serious injury or the death. Generally, the guidelines there just take into account the quantity, and not the death. And which is why Judge Meyer, that the government urged, and Judge Meyer referred over to section 5k2.1. In the alternative, Judge Meyer indicated that he would vary and impose precisely the same sentence. And one of the reasons for that was certainly the death, which he made very clear on the record. Isn't the risk of death implied in the sentencing guidelines just for the drug offense? Isn't that always there? Your honor, respectfully, no, I don't think that's the case. If the government had charged Mr. Waver, which it could have in this case, because the government's evidence, as this court has seen, did meet the Burge standard. Furanyl fentanyl was determined to be the cause of death. In such a circumstance, we would be under a completely different guideline provision. And in the government's brief, I can point the court, if I can just quickly turn to that page. Mr. Waver would have been facing a mandatory minimum term of imprisonment under the statute of 20 years. And in addition, would be facing a much more significant term under the guidelines as well. And I believe that is actually in the government's footnote eight, pages 44 to 45 of the government's brief. As Judge Arterton discussed in one of the district court cases, this is Russo, which the government cited. Well, the drug guidelines do take into account an inherent risk of drug dealing. They don't, except for those provisions where the death is charged, don't take into account the most dire circumstance, which is the death. And I think that's why section 5K2.1 is a potential option for courts to include that. Does the government have to make any showing at all if it has not charged a death-related offense and just charged drug distribution in order for the court to impose a 5K2.1 enhancement? Does the government, is the court entitled to just presume knowledge? And Rivalta, or a statement in Rivalta suggested that some level of scienter was required. What's your position about that? So, your honor, that is a good question. So, in the Rivalta case, that was a decision, I believe, from 1989. There has been a later decision by this court, which the government cites, which is Cordova-Murgis. And I believe the date of that decision was in the year 2000. The court there discussed just a plain reading of section 5K2.1, which doesn't presume or doesn't require that the government show any particular knowledge. It says that if death results, the court may elect to depart. It does, the section does require that the court consider the other factors that are identified. And that includes the intent, it includes knowing risk, it includes the dangerousness of the defendant's conduct. It does require that. And I think the Rivalta case is a little different, because in the Rivalta case, the causal connection between the death and the offense was not apparent. But here, the language of 5K2.1 says to the extent to which, the extent of the increase should depend on the dangerousness of conduct, the extent to which death was intended or knowingly risked. Yes, Your Honor. Certainly for the extent of the departure, but I don't think eligibility for a departure. That's the government's position. So the court would be entitled to apply an increased sentence, and the amount would just depend upon what kind of knowledge was shown. That's the government's position, Your Honor, and that's- That's just based on the language of the guidelines, if death results. And then the question I think before us is the level of the departure upward under 5K2.1. Your adversary says that there was no factual basis, other than the government's initial recitation or reference to everybody in Connecticut. If you read the papers, you read about overdoses that result in death. Is that enough? And if that's true, then why isn't that enough for every drug dealer? Well, Your Honor, I think that we have a lot more than that. So that in and of itself may not be enough. What Judge Meyer did in this case is he had a very, as the court saw, a very, very thorough discussion of the record. And there were a number of undisputed facts, which I think Judge Meyer relied on in making that determination, that inference that Mr. Waver was aware. And I think what Judge Meyer said, and this is important, is that basically, I don't believe any suggestion for a moment. You didn't have a good idea that what was in those baggies was potent. And that's in the record at the joint appendix at 203 to 204. So not necessarily that it was furanyl, fentanyl exactly, but that this was a potent substance. What was the basis for that? I mean, is that what we or I might describe as a credibility determination? What is that? When he says I don't believe. I think that the court did make a finding that Mr. Waver was aware that he was selling something that was highly potent. He later referred to that as an ultra- I know that he made a finding. The entire argument, I think, from your adversary is that the finding was without evidentiary basis. Yes, Your Honor, and there are a number of undisputed facts that the court had to rely on. And so one of those factors, for example, is that Mr. Waver admitted as part of this case that he distributed dangerous drugs for a fairly lengthy period of time. He was charged between late 2016 and May 4th of 2017, which is the date of his arrest. When he was arrested, law enforcement seized a number of substances from Mr. Waver. Some of those substances contained crack cocaine, furanyl fentanyl, fentanyl, another opioid- They weren't separate. They were in the packaged goods, right? Your Honor, there was some mixing of, so there was some- But I mean, they didn't get fentanyl separate. Separate from other- That's correct. I think that may be outside what's in the record, Your Honor, but that's correct, Your Honor. Or I believe that's correct. There was separate fentanyl. I don't think that there was separate fentanyl, Your Honor. I don't- He didn't do the mixing. I don't know if it was, to be honest, Your Honor, I don't remember the answer to that, whether that it was mixed. In this case, there's been a lot of discussion about whether it was mixed, but in this case, it was actually furanyl fentanyl. There's not, we don't have evidence it was mixed with heroin. It was furanyl fentanyl. That was the government's evidence. I don't recollect precisely what was mixed- That's what was contained in these Kiss Me bags. Yes, there was furanyl fentanyl, Your Honor. And I don't have information about the potency. Was it, would it be your position, just to get back to this clearly erroneous argument, that every time fentanyl is sold by a drug dealer and that results in death, that in and of itself is inherently a basis to depart upward. Because it's a knowing risk of death. Is that the government's position? I think that it does depend a little bit on the circumstances. In a case like Mr. Waver's, where a defendant is aware and is intending to sell a dangerous substance, whether it's heroin, whether he thinks it's heroin, or whether he thinks it's fentanyl- I assume that the drug dealer is aware that he or she is selling fentanyl. Is it the government's position that that necessarily is a basis, inherently is a basis for an upward departure? Certainly with fentanyl, Your Honor, because there is a very real risk of death. I think that that is widely understood, particularly by people who are surrounded by people who are using drugs and who are selling them themselves. That's a fair argument, but that must be the argument. Yes, Your Honor, it is. And there were other factors that Judge Meyer did have to consider as well. Mr. Waver maintained an apartment, as one of your honors mentioned. There's a very, very scant employment history, and there's a digital scale that's found in his apartment. I think that Judge Meyer drew a permissible conclusion that Mr. Waver was a career drug dealer, or a professional drug dealer. But his convictions were for possession, except for this one, right? There were four convictions, I believe, Your Honor, for possession. One for possession with intent to sell, I believe the arrest date was in 2013. There was another pending, so it hadn't been resolved, but a pending case for possession with intent to sell that was pending at the time that the drugs were distributed in this case. I see that I'm out of time, Your Honors. If the court doesn't have any other questions, I will rest on our briefs, but I submit that Judge Meyer's sentence should be affirmed. Thank you, Counsel. Thank you, Honors. You've reserved some time for rebuttal. We'll hear it now. Thank you. I want to address the government's contention that 2D11 accounts really just for the amount of drugs. We take issue with that. We don't agree with that. I think it's a well settled fact that when drugs were assigned certain offense levels under 2D11, consideration as to how they impacted people when used- Was built in. Was built in, thank you, Your Honor. Otherwise, we wouldn't have higher base offense levels for more serious, dangerous drugs like fentanyl or heroin. And I do cite- Let me just interrupt for a second to ask. So when those levels were assigned, it was decades ago now. The quality of drugs that seems to be being dealt right now and their purity or lack of purity seems to have changed and gotten much more potent and lethal. So, is that a fair statement, would you agree? Or not? I don't know that I have the basis. I think it's a very logical statement, and I wouldn't disagree with that. I just don't know that I have the expertise. But certainly, one of the cases I cited in our reply brief, and it's really just sort of a peripheral reference to what I'm talking about. But I think it makes the point in Chaudhary, when this court was upholding the district court's finding that the pills, and I apologize, I don't know exactly what the pills in that case were. But they were sort of these unspecified pills that weren't covered by 2D11. This court determined that the district court correctly categorized the pills in line with MDMA and ecstasy in part because of the similar effects that the pills had on the central nervous system. And I think that just underscores my point that when the guidelines were enacted, way back in 1987, or thereabouts, the commission was considering the impact. Another point I just wanted to make as to the facts, the decedent, for Annel Fentanyl was in the decedent system we haven't debated, causation. She purchased the Kiss Me bags from Mr. Waver, is what the facts essentially show. The Kiss Me bags were seized from his apartment, and they did have heroin in them. At some level, it was believed that they contained heroin. But heroin, if you look at the sealed PSR, the revised PSR, it includes the amount of each drug that they found. Heroin being one, Prac being a separate one, and then the fentanyl, for Annel Fentanyl. So I don't think it's a fair inference that the bags were separated out with for Annel Fentanyl and heroin, and I don't mean to be glib, but I think it was sort of a grab bag of whatever you get may have heroin, may have fentanyl. Maybe- To the issue of whether he knowingly did this in any event. Yes, thank you, Your Honor. And I believe that I am just about out of time, and I- On the double counting, under 2D1.1, Judge Meier did not apply the 43, that is 2D1.1A1, is that right? I'm trying to unpackage the double counting issue. Because I think that the government is saying that those provisions of 2D1.1 that relate to establishing the death or serious bodily injury resulted, did not apply here. Your Honor, I apologize if I'm misunderstanding this, but he didn't apply any commentaries, if that's what Your Honor is referring to. Well, commentaries or, right, those provisions that require a base offense level or trigger a base offense level where death results. Correct, he did not apply that. How is that double counting? I actually didn't characterize this as double counting, and I apologize, Your Honor. I probably, well, I don't think I had an opportunity to correct it. The double counting argument actually went to considering Mr. Waver's offense level. That was actually a separate argument that I didn't even get to today. But I think double counting could be a way to characterize the initial argument. I think the point of the initial argument really is, as I apologize, one of your honors had sort of crystallized that the factual basis for the upward departure was erroneous, and then certainly there is an argument later in the brief that . . . What was the erroneous or inadequate? Inadequate. Inadequate, and I think it ends up being an erroneous basis to raise that . . . to upwardly depart or to vary upward, because there was no such evidence, preponderance standard was not employed. And we ask that you reverse the factual findings, vacate the sentence, and remand to the district court. Thank you very much. Thank you. Thank you. Thank you both. We'll reserve decision. That's the last case on our calendar, so I will ask the clerk to adjourn court. Court is adjourned.